UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SANDRA FAY GIPSON, AS ADMINISTRATRIX
OF AND PERSONAL REPRESENTATIVE ON
BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF THE ESTATE OF
CHARLES ELLIOT MCGREW                                                                    PLAINTIFF

V.                                                         CIVIL ACTION NO. 3:16-CV-624-DPJ-FKB

MANAGEMENT & TRAINING CORPORATION
AND JOHN AND JANE DOES 1–100                                                           DEFENDANTS

ORDER

Plaintiff Sandra Gipson has sued Defendant Management & Training Corporation ("MTC") on behalf of the estate of Charles McGrew—McGrew died as an inmate in a prison MTC managed. This case is before the Court on two motions: MTC's Motion for Summary Judgment [51] and Gipson's Motion for Adverse Inference [57] based on alleged spoliation. For the reasons that follow, the Court finds that both motions should be denied, although Gipson's motion will be denied without prejudice because it is premature.

I.     Background

On June 10, 2014, inmate Brian Bullock murdered McGrew in his cell at MTC's East Mississippi Correctional Facility ("EMCF"). Bullock attempted to cover up the murder by staging it as a suicide but eventually confessed. In her suit, Gipson asserts Eighth Amendment claims under 42 U.S.C. § 1983 and negligence-based claims under state law. The Court has both personal and subject-matter jurisdiction.

II.    Motion for Summary Judgment

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when the evidence reveals no genuine dispute regarding any material fact and that the moving party is

entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

In this case, MTC seeks summary judgment as to Gipson's § 1983 claims and her state-law claims. Because the issues related to the state-law claims are more obvious, the Court will begin there.

    A.    Negligence Claims

Gipson says MTC is vicariously liable because its employees negligently failed to protect McGrew and that MTC is directly liable for negligently hiring, training, and supervising its

officers. To succeed on a negligence claim, a plaintiff must establish four familiar elements: duty, breach of duty, causation, and damages. *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So. 2d 413, 416 (Miss. 1988).

MTC starts its motion with the first element, arguing that as "the operator of a large prison with convicted inmates[, it] owes no general duty to keep every prisoner free from harm." Def.'s Mem. [53] at 13. It explains that while Mississippi jailers may have a duty of reasonable care, the state has not extended that duty to large prison facilities like EMCF. *Id.* at 14. So the Court must first determine whether MTC owed McGrew the duty of reasonable care.

MTC bases its duty argument on *Bogard v. Cook*, where the district court held that supervisory officers employed by the state at its maximum-security prison in Parchman, Mississippi, were not subject to a simple-negligence standard under common law. 405 F. Supp. 1202, 1215–16 (N.D. Miss. 1975), *aff'd*, 586 F.2d 399 (5th Cir. 1978). In reaching that result, the court distinguished cases holding county sheriffs liable for negligence:

> It would be rare for a sheriff to have custody of more than two dozen prisoners at any time, at least half of whom would probably be pre-trial detainees rather than persons serving time pursuant to a conviction and sentence of a state court. On the other hand, we have seen that the superintendent at Parchman is charged with the custody of approximately 2000 inmates, all of whom are convicted felons.

*Id.* at 1215−16 (distinguishing *Farmer v. State*, 79 So. 2d 528 (1955); *Mississippi v. Durham*, 444 F.2d 152, 157 (5th Cir. 1971)). MTC seizes on this language and argues that because EMCF is large, there can be no claim for negligence against MTC.

MTC reads too much into this dicta. Significantly, *Bogard* addressed "the test for immunity of public officials" facing common-law claims for acts taken within the scope of their authority. *Id.* at 1215. Indeed the Fifth Circuit affirmed on that same basis. *See Bogard*, 586 F.2d at 401 ("[T]he qualified immunity enjoyed by all the employee-defendants could not be overcome on the basis of simple negligence.").

3

Unfortunately for MTC, it is not an individual state official as in *Bogard*, and it is not otherwise entitled to immunity. Miss. Code Ann. § 47-5-1219(b) (establishing that sovereign immunity does not extend to private-prison contractors); *Richardson v. McKnight*, 521 U.S. 399, 405–06, 412 (1997) (finding "no evidence" that pre-section 1983 common law "gave purely private companies or their employees any special immunity from suits"); *see also Leavitt v. Carter*, 178 So. 3d 334, 339 (Miss. Ct. App. 2012) (holding that "the immunity conferred under the MTCA does not apply to private prisons operated under a contract with the State"). Absent an argument that MTC enjoys immunity from suit, *Bogard* is inapplicable.

Aside from *Bogard*, MTC offers no legal authority suggesting that the size of an entity shields it from the duty of reasonable care. To the contrary, other courts have applied that standard to private-prison entities—including MTC. *See Lonoaea v. Corr. Corp. of Am.*, 665 F. Supp. 2d 677, 682 (N.D. Miss. 2009) ("The court agrees that plaintiffs have established triable fact issues regarding whether [Corrections Corporation of America] acted negligently in this case."); *Elliott v. Mgmt. & Training Corp.*, No. 3:16-CV-088-MPM-JMV, 2017 WL 3089693, at *11 (N.D. Miss. July 19, 2017) (applying negligence standard to MTC).[1]

Because MTC owed McGrew the duty of reasonable care, the Court must next consider MTC's argument that Gipson has not offered sufficient proof supporting her negligence claims. MTC starts by asserting that the vicarious-liability claims fail because Gipson has not identified any MTC employees whose negligence proximately caused McGrew's death. Def.'s Mem. [53] at 15. It is not clear whether MTC's argument is legally correct, and it offers no authority directly supporting it. *Id.* Regardless, Gipson clearly identifies such individuals, including but

---

[1] Of course the size of the facility might factually speak to the level of protection that is reasonable.

4

not limited to, Captain Christopher Dykes, whose alleged acts will be discussed later. Accordingly, the case cannot be dismissed on this basis.

MTC's final argument challenges the causation element. The Mississippi Supreme Court has explained that

> proximate cause requires the plaintiff to show that the defendant's conduct was the cause in fact and the legal cause of the plaintiff's injury. Cause in fact means that, but for the defendant's negligence, the injury would not have occurred. After cause in fact has been established, negligence will be deemed the legal cause if the injury is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act.

*Huynh v. Phillips*, 95 So. 3d 1259, 1263 (Miss. 2012) (internal citations and quotation marks omitted). "[C]ausation is generally a matter for the jury." *Ready v. RWI Transp., LLC*, 203 So. 3d 590, 594 (Miss. 2016).

Here, MTC says Gipson failed "to identify any act or omission on the part of MTC or any of its employees that actually caused McGrew's murder." Def.'s Reply [66] at 16. But the more accurate question is whether MTC and its officers negligently failed to protect McGrew from Bullock. And the record, when viewed under the Rule 56 standard, creates a jury question on that issue.

Gipson offers a number of negligence theories but at least one seems pretty obvious—that MTC and Dykes should have segregated Bullock rather than place him in McGrew's cell. There is no dispute that Bullock incurred a debt to the Vice Lords prison gang while incarcerated at the Walnut Grove Correctional Facility ("WGCF") and that the gang told him he had to either pay back the debt or "smash" another inmate. *See* Bullock Dep. [65-1] at 2–5. Bullock apparently decided he could not go through with it, so he told prison officials and was placed in protective custody. *Id.* at 4–5. Eventually, WGCF concluded that Bullock could not be protected at WGCF, so they transferred him to EMCF. Sistrunk Mem. [65-4]. On his way out,

WGCF officials documented that Bullock would still require protection once transferred. *See id.*; Sistrunk Dep. [65-3] at 6.

When Bullock arrived at EMCF, he advised MTC's classification officer that he had been in protective custody at WGCF and requested the same protection at the new facility. Bullock Dep. [65-1] at 23–24. Although EMCF did not have protective custody per se, it would segregate inmates when deemed appropriate. *Id.* at 23–25; Dykes Dep. [65-5] at 8. But that was not offered to Bullock, and he was sent to the general population. Bullock Dep. [65-1] at 23–25. There, he was greeted by members of the Vice Lords who reminded him that he still had a debt to repay. *Id.* at 20–22.

Bullock tried to get the money from his father, who called Captain Dykes and informed the officer about the threats to his son. *Id.* at 18. Dykes then spoke with Bullock, who told him what happened at WGCF and that he had to either repay the money or assault another inmate. *Id.* 18–19, 35. Bullock again requested help, and while there is a fact question about what happened next, Dykes did not look at the WGCF records or put Bullock in segregation. Dykes Dep. [65-5] at 4–6. Later, Bullock asked Investigator Mike Rice whether he could be put in "lockdown" (i.e., segregation) but was allegedly told he did not qualify. Bullock Dep. [65-1] at 27–28.

Bullock's cellmate in general population was Charles McGrew. Unfortunately, McGrew also owed a debt to the Vice Lords, and gang members told Bullock to either collect it or kill him. *Id.* at 18–20, 22. If Bullock failed, gang members threatened to kill Bullock. *Id.* at 29. When McGrew refused to pay, Bullock strangled him with bed sheets. *Id.* at 17.

In sum, Bullock allegedly told MTC—perhaps as many as four times—that he was in danger and was being forced to hurt someone. While there is a fact question whether an

6

adequate investigation followed, there is no dispute MTC did not segregate Bullock. Instead, MTC placed him in the cell with McGrew where he did what he said he would do. Jury questions therefore exist regarding both cause-in-fact and legal cause.

Gipson also offers competent evidence from experts, a former EMCF guard, MTC's policies, and other sources regarding additional ways MTC and its employees may have breached the duty of care. That record creates jury questions on at least the following disputed facts: MTC was generally on notice of the need to better protect inmates from gang-related violence based on prior lawsuits against it; guards did not conduct cell checks as frequently as they should have; Bullock knew the checks were lax, which made the murder easier; Bullock may have been discouraged from attempting the attack had MTC checked the cells more frequently; and MTC provided inadequate training and supervision resulting in the atmosphere of gang violence and deficient security measures.[2]

While it remains to be seen whether the evidence will be sufficient at trial to support all of these contentions, there is enough here to go to a jury. MTC's motion for summary judgment on the common-law negligence claims is denied.

B.     42 U.S.C. § 1983

In addition to her common-law claims, Gipson also pursues federal claims under § 1983, generally asserting that MTC failed to protect McGrew from Bullock. MTC succinctly states, however, that "Plaintiff cannot establish any unconstitutional policy or custom on the part of MTC which was the proximate cause of McGrew's death." Def.'s Mem. [53] at 1. MTC is

---

[2] MTC challenges the testimony of the former guard Matthew Naidow under Federal Rules of Evidence 601 and 701. While there may be portions of the testimony that create close calls under Rule 702, most of what he said constitutes valid lay-witness testimony based on personal knowledge. Regardless, the motion fails even without Naidow.

7

correct that Gipson must meet the policy-or-custom element—something that is not required for common-law negligence. Whether she can is seriously disputed.

That said, we are not dealing with an immunity issue that would require a threshold ruling. Moreover, the evidence related to the federal claims overlaps the evidence supporting the state-law claims. And while the § 1983 claims may raise a closer question under Rule 56, the Fifth Circuit has frequently observed that "even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial.'" *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)). This is one of those times; the § 1983 claims will be carried over to trial.

III. Motion for Adverse-Inference Instruction

Gipson says MTC spoliated evidence. "Under the spoliation doctrine, a jury may draw an adverse inference that a party who intentionally destroys important evidence in bad faith did so because the contents of [the evidence] were unfavorable to that party." *Schreane v. Beemon*, 575 F. App'x 486, 490 (5th Cir. 2014) (citation omitted). Here, Gipson says MTC spoliated surveillance video, prison logbooks, and count slips. The logbooks and count slips would have allegedly shown when various officers performed their required rounds. There is no dispute that the evidence is no longer available. As discussed below, Gipson's motion is premature, but the Court will address a few procedural issues.

On January 4, 2016, MTC was notified that Gipson, on behalf of McGrew's estate, would be bringing a lawsuit concerning his death. Once suit commenced, Gipson propounded a request for production of documents that included surveillance footage around the time of McGrew's death. MTC responded that "[t]here exists no surveillance video." Def.'s Resp. to Reqs. for

8

Produc. [70-3] at 3. A few days after receiving MTC's response, Gipson deposed Marjorie Brown, MTC's Vice President for Region IV, about the surveillance footage. Brown stated in her Rule 30(b)(6) testimony that she made no effort to locate the surveillance footage and, further, was not aware of any attempts made by EMCF's staff to locate the footage. Brown May 9, 2017 Dep. [74]. MTC now says that this footage was deleted "as a routine matter of course." Def.'s Resp. [69] at 3. Gipson did not make a similar request for the missing logbooks and count slips, but she claims to have informally requested this evidence from MTC's counsel. MTC disputes the motion on procedural and substantive grounds.

   A.   MTC's Procedural Arguments

MTC starts with three procedural arguments. First, it says the Court must deny Gipson's motion because she failed to file a motion to compel the lost evidence. In other contexts, this argument might carry more weight. Federal Rule of Civil Procedure 37(a) allows a party to seek an order compelling production. And Rule 37(b) provides sanctions when a party "fails to obey an order to provide or permit discovery." But this rule does not apply in this scenario.

For starters, Gipson accepted MTC's representation that the evidence is gone. Thus, seeking an order to compel under Rule 37(a) would have been futile. Moreover, the Court has inherent authority to sanction spoliation apart from Rule 37(b). *See, e.g.*, *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010) ("Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed in federal courts through the inherent power to regulate the litigation process if the conduct occurs before a case is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct.").

As to the surveillance video specifically, MTC's Rule 37(b) argument fails if MTC is correct that the surveillance video constitutes electronically-stored information ("ESI") governed by Rule 37(e). MTC is probably correct that the surveillance video falls under Rule 37(e).[3] And that rule states in relevant part:

> **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> . . . .
>
> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> . . . .
>
> > **(B)** instruct the jury that it may or must presume the information was unfavorable to the party.

Fed. R. Civ. P. 37(e). So unlike Rule 37(b), Rule 37(e) does not require prior violation of a court order before a sanction—including an adverse-inference instruction—may be imposed. The lack of a prior discovery motion and order does not preclude an adverse instruction.

MTC's second procedural argument is that Gipson's spoliation motion violates the scheduling order and Uniform Local Rule 7(b)(2)(C). That rule states: "A party must file a discovery motion sufficiently in advance of the discovery deadline to allow response to the motion, ruling by the court and time to effectuate the court's order before the discovery

---

[3] Several district courts have reached that conclusion. *See, e.g.*, *Storey v. Effingham Cty.*, No. CV415-149, 2017 WL 2623775, at *3 (S.D. Ga. June 16, 2017) ("Here, there's no debate that the surveillance and taser videos are ESI."); *Javaid v. Pantry, Inc.*, No. CV 12-2481, 2013 WL 12228712, at *3 (E.D. La. Feb. 27, 2013) (discussing whether video footage is exempt from Rule 26(a)(1)(A)'s requirement to produce ESI); *Peterson v. Arrow Plastic Mfg. Co.*, No. CV 11-156-JJB-SCR, 2011 WL 13175674, at *2 n.6 (M.D. La. Dec. 13, 2011) ("Assuming the photographs and/or videos are still in the camera's internal memory or on memory card, downloading them to a computer usually only requires connecting the camera to a computer with a commonly available USB cable. . . . Production of electronically stored information is a matter which counsel should have discussed at the Rule 26(f) . . . conference.").

deadline." L.U. Civ. R. 7(b)(2)(C). But it is not apparent that Gipson's motion is a "discovery motion" in this context. The obvious purpose of Rule 7(b)(2)(C) is to resolve disputes over the scope of discovery while time remains to conclude it. This case is different. As stated, Gipson accepted MTC's position that the evidence is forever lost, so there was no need to file a typical discovery motion before the discovery deadline. Instead, she now seeks a jury instruction, and the deadline to submit instructions has not yet been set.

Further, viewing this motion as something other than a discovery motion is consistent with Rule 37(e), the comments to which say that motions seeking sanctions for the failure to preserve ESI can be resolved as "pretrial motions" or even during a charge conference. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The Court therefore concludes that under the facts of this case, Gipson's motion should not be denied on this procedural argument.

MTC's third procedural argument may be better. It contends that Gipson may not receive an adverse-inference instruction as to the logbooks and the count slips because Gipson never formally requested them in discovery and it is now too late to do so. Factually, MTC appears to be correct. But Gipson responds with two points: (1) she informally requested the evidence through counsel and (2) MTC had a duty to produce the documents as pre-discovery disclosures under Rule 26(a)(1)(A)(ii). It is not apparent that these arguments are legally sufficient, but because Gipson raised them in reply, MTC has not had the opportunity to respond. The Court therefore reserves ruling on this issue and will give the parties an opportunity to address it at the pre-trial conference.

B.  Substantive Arguments

Starting with the video, the Court assumes it constitutes ESI governed by Rule 37(e). As noted above, the comments to Rule 37(e) state that a motion can be raised at various times, including the charge conference. The comments also say:

> If a court were to conclude that the intent finding should be made by a jury, the court's instruction should make clear that the jury may infer from the loss of the information that it was unfavorable to the party that lost it only if the jury first finds that the party acted with the intent to deprive another party of the information's use in the litigation.

Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

The Court will obviously hold a charge conference after the parties rest at trial and sees no reason to treat this requested instruction differently. Gipson has submitted some evidence regarding duty, proportionality, and intent, but the issues will be easier to assess on a full record. And consistent with the Advisory Committee's note, the Court would at least consider allowing the jury to decide the intent issue—assuming there is sufficient trial evidence supporting it. The Court reaches the same conclusion as to the logbooks and count slips, although they are not ESI and therefore fall under the Court's inherent authority rather than Rule 37(e).[4]

IV.  Conclusion

The Court has considered all the parties' arguments. Those not specifically addressed would not change the outcome. For the foregoing reasons, MTC's Motion for Summary

---

[4] This ruling should not change the evidence. If MTC committed spoliation, it would likely be admissible under the well-known consciousness-of-guilt theory. *See, e.g., United States v. Jones*, 873 F.3d 482, 498 (5th Cir. 2017) (affirming admission of evidence showing a "consciousness of guilt").

Judgment [52] is denied; Gipson's Motion for Adverse Instruction [57] is denied without prejudice and will be addressed at trial.

**SO ORDERED AND ADJUDGED** this the 6th day of February, 2018.

s/ *Daniel P. Jordan III*<br>
CHIEF UNITED STATES DISTRICT JUDGE